**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

LOCAL ACCESS, LLC and BLITZ
TELECOM CONSULTING, LLC,

       Plaintiffs/Counter-Defendants,

v.                                   Case No:  6:14-cv-399-Orl-40TBS

PEERLESS NETWORK, INC.,

       Defendant/Counter-Plaintiff.

_____

<u>**ORDER**</u>

This cause comes before the Court on the following:

1. Plaintiffs' Objection to November 12, 2005 Order on Statement of Position on Orders and Stipulations of Record at the October 14, 2015 Hearing (Doc. 165), filed November 26, 2015;

2. Defendant's Opposition to Plaintiffs' Objections to Magistrate Smith's October 12, 2015 Order (Doc. 173), filed December 10, 2015;

3. Plaintiffs' Objection to December 18, 2015 Order on Renewed Motion to Compel Corporate Representative Deposition Following Discovery Deadline (Doc. 181), filed December 31, 2015; and

4. Defendant's Opposition to Plaintiffs' Objection to Magistrate Smith's Order (Doc. 184), filed January 14, 2016.

Upon consideration and after review of the record, the Court overrules Plaintiffs' objections and affirms the Magistrate Judge's orders.

## I.    BACKGROUND

This lawsuit arises out of a dispute between Plaintiffs/Counter-Defendants, Local

Access, LLC and Blitz Telecom Consulting, LLC (collectively, "Plaintiffs"), and

Defendant/Counter-Plaintiff, Peerless Network, Inc. ("Peerless"), over the planned sale of

the Blitz company to one of Peerless' competitors.  On August 17, 2015, Plaintiffs noticed

the deposition of Peerless' corporate representative pursuant to Federal Rule of Civil

Procedure 30(b)(6) to appear for a deposition scheduled for August 27, 2015.  (Doc. 165-

1).   Relevant to this Order, paragraphs 5 and 6 of Schedule A to Plaintiffs' notice of

deposition provided the following two topics of inquiry:

> 5.   The amount of traffic, measured in minutes of use ("MOU")
> and measured in revenue billed, revenue received and/or
> collected, generated by Blitz on the Peerless networks for
> each month during the entire term of the IP Control
> Agreement that is attached to Peerless's Answer and
> Counterclaim as Exhibit 1.
>
> 6.   The total amount of traffic, measured in MOU and revenue
> billed, revenue received and/or collected on the Peerless
> networks for each month during the entire term of the IP
> Control Agreement that is attached to Peerless's Answer and
> Counterclaim as Exhibit 1.

(*Id.* at p. 3).  On August 27, 2015, Peerless produced its Chief Financial Officer, Douglass

Lee, as its corporate representative having knowledge of these two topics of inquiry.

During the deposition, however, Plaintiffs felt that Mr. Lee lacked sufficient knowledge on

both topics; Plaintiffs thereafter moved to compel the deposition of a corporate

representative who did.  (Doc. 94).

On October 14, 2015, Magistrate Judge Thomas B. Smith held a hearing on

Plaintiff's motion to compel.  (Doc. 138).  During a recess of that hearing, the parties

reached an agreement regarding the deposition testimony sought by Plaintiffs and

presented Magistrate Judge Smith with the following stipulation:

> As it relates to Requests 5 and 6, Peerless Network will within two weeks provide us [Plaintiffs] with an affidavit and hopefully sufficient to give us information that would satisfy our Request Nos. 5 and 6.
>
> Should we not be satisfied with the content of the affidavit, Peerless will provide its chief financial officer, Douglas [sic] Lee, for testimony at a deposition to be scheduled at the time that reconvene the depositions anyway to take the depositions of two witnesses who were unavailable otherwise when we did take the depositions back in September.

(Doc. 149, 143:8–19) (mistakes in orignial).

On November 3, 2015, Peerless produced Mr. Lee's sworn declaration wherein Peerless produced spreadsheets purportedly disclosing the amount of traffic, revenues billed, and revenues collected in response to topics 5 and 6. (Doc. 165-2). Upon review, however, Plaintiffs were not satisfied with these spreadsheets—claiming that they were unable to verify the numbers listed—and elected to proceed with Mr. Lee's deposition.

Prior to Mr. Lee's second deposition, Magistrate Judge Smith held a telephonic discovery hearing on November 6, 2015 at Plaintiffs' request. (Doc. 157). Plaintiffs expressed their concerns about the numbers in Peerless' spreadsheets, questioned Mr. Lee's ability to testify competently regarding the spreadsheets' contents, and demanded to review the underlying documents or other data used by Peerless to create the spreadsheets. (Doc. 174-1, 2:20–5:23). Magistrate Judge Smith determined that Plaintiffs' concerns were premature, as Mr. Lee's deposition had not yet occurred. (*Id.* at 13:14–14:2). As a result, Magistrate Judge Smith declined to order any relief, but invited the parties to call the Court from the deposition if it became necessary. (*Id.*).

Mr. Lee appeared for deposition on November 12, 2015 as scheduled. During the deposition, however, Plaintiffs again felt that Mr. Lee lacked sufficient knowledge on topics 5 and 6 and took issue with the fact that Mr. Lee brought no documentation with

him to explain the numbers in Peerless' spreadsheets.   As a result, Plaintiffs accepted Magistrate Judge Smith's invitation and called the Court from the deposition.   After hearing argument from the parties, Magistrate Judge Smith ruled that Peerless was not required to produce the documents forming the basis of the numbers in the spreadsheets. (Doc. 165-3, 15:12–17:12).   Magistrate Judge Smith reasoned that the documents Plaintiffs requested were not contemplated by the parties' October 14, 2015 stipulation and were not otherwise raised for the Court's consideration prior to Mr. Lee's November 12, 2015 deposition.  (*Id.* at 17:5–12).

On November 26, 2015, Plaintiffs filed a renewed motion to compel the deposition testimony of a corporate representative with sufficient knowledge on topics 5 and 6. (Doc. 166).  Plaintiffs argued that, despite the two depositions of Mr. Lee, Peerless failed to produce a corporate representative who could testify competently on topics 5 and 6. Plaintiffs again sought a corporate representative who could do so, along with "[a]ll backup documentation supporting the amounts reflected on the spreadsheets."  (*Id.* at pp. 20–21).  On December 18, 2015, Magistrate Judge Smith denied Plaintiffs' renewed motion to compel on the grounds that Plaintiffs had already objected to the November 12, 2015 denial of Plaintiffs' request for documents and that to resolve Plaintiffs' current motion would risk inconsistent outcomes where those objections were under advisement by the undersigned.  (Doc. 176).  Magistrate Judge Smith additionally observed in his order that Plaintiffs never requested the sought-after documents through their notice of deposition or any other discovery request.  (*Id.* at p. 4).

Now before the Court are Plaintiffs' objections to Magistrate Judge Smith's November 12, 2015 and December 18, 2015 orders in which he denied Plaintiffs' motions to compel deposition testimony and the production of documents.  Plaintiffs renew their

position that Mr. Lee's deposition testimony revealed that he lacked sufficient knowledge about topics 5 and 6 and that his failings demand that Peerless produce the documents underlying the numbers in Peerless' spreadsheets.  Peerless has responded to Plaintiffs' objections and the matter is ripe for review.

## II.    STANDARD OF REVIEW

A district judge may designate a magistrate judge to hear and determine both dispositive and non-dispositive matters.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a), (b).  Unlike when deciding a matter that is dispositive in nature, a magistrate judge may rule directly on a non-dispositive matter without submitting a report to the presiding district judge.  Fed. R. Civ. P. 72(a).  Any party who disagrees with the magistrate judge's decision has fourteen days from the date of the decision to seek the district judge's review of the matter by filing objections to those specific portions of the decision disagreed with.  *Id.*  The district judge then reviews the magistrate judge's decision for clear error.  *Id.*  When reviewing for clear error, the district judge will only set aside decisions of the magistrate judge that are contrary to law or that otherwise leave the district judge "with the definite and firm conviction that a mistake has been committed."  *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

## III.   DISCUSSION

Federal Rule of Civil Procedure 30 allows a party to depose any person, including another party, in furtherance of litigation.  Fed. R. Civ. P. 30(a)(1).  When a party names a private corporation as the deponent, the named corporation must designate one or more persons to testify on its behalf.  Fed. R. Civ. P. 30(b)(6).  The person or persons designated by the corporation must be able to "testify about information known or reasonably available to the [corporation]."  *Id.*  Similarly, the designated corporate

representative must bring with him all documents the deposing party listed in the notice of deposition or requested through a properly served subpoena duces tecum.  Fed. R. Civ. P. 30(b)(2).  The failure to follow these rules may warrant the imposition of sanctions.  *See* Fed. R. Civ. P. 30(d)(2), 37.

Plaintiffs ask the undersigned to set aside Magistrate Judge Smith's determinations that Mr. Lee held sufficient knowledge of topics 5 and 6—that is, the amount of traffic, along with the revenues billed and collected on that traffic, both for traffic generated by Blitz on Peerless' networks (topic 5) and for all traffic generated on Peerless' networks (topic 6).  In addition to the spreadsheet attached to Mr. Lee's sworn declaration disclosing the numbers vis-à-vis Blitz in response to topic 5, Mr. Lee testified on the amount of Blitz traffic and the revenue billed on that traffic as follows:

> Q.  Mr. Lee, can you tell me the precise amount in reviewing [the spreadsheet] of Blitz revenue billed from November 25, 2010, to December 24, 2010?
>
> . . . .
>
> A.  Yes.  [Amount redacted].
>
> Q.  Why is that column entitled Billed Estimate? Do you know?
>
> A.  So when we have, in our systems, when we have billings, I send a bill, a carrier access bill to a carrier . . . and it is for all the minutes they send to all of my phone numbers. So when they send—when I send out the bill, it is to [Carrier 1] for X million minutes for each different type of call, so by jurisdiction, or to [Carrier 2] for the same thing . . . ; and then when—there is no exact way to know exactly how much is for a single phone number.
>
> Q.  When you send a bill out, I'm assuming then that you are collecting information from your various clients to aggregate into that bill that you just said you sent to [Carrier 1]?
>
> A.  Not from my clients. From our systems.
>
> Q.  From your systems, okay.
>
> A.  Because these are our phone numbers.

Q.   From your systems?

A.   Yes, so we basically bill what I can figure out, and how we come to this revenue billed estimate is we know which phone numbers are associated with Blitz.

Q.   Okay.

A.   So we can count the number of minutes to Blitz phone numbers, and I know the jurisdiction of the calls to the Blitz phone numbers. There's interstate calls, interstate interlata. There's intrastate intralata and interstate intralata and there's local. So I now know the minutes coming into the phone numbers, and I know the jurisdiction of those minutes.

Q.   Do you, when you send the bill out to someone like [Carrier 1], do you aggregate the number of minutes, multiply that by the rates that you were just discussing, is that the bill that you send?

A.   Not exactly. So I have—I aggregate the rates for all of my numbers from that carrier specifically.

Q.   Yes.

A.   And then there are different rates by different states for interlata interstate, intralata interstate—there's different rates for all of those.

Q.   In your system does it indicate the Blitz numbers, Blitz phone numbers?

A.   Our system does, but we do not designate that to the carrier.

Q.   I understand that, but your system designates the Blitz numbers?

A.   Yes.

Q.   Your system designates the minutes on those numbers?

A.   Yes.

Q.   Your system designates the types of minutes that they are as you were just discussing?

     . . . .

A.   Yes.

Q.   Okay. So if you wanted to, you could then take those numbers, multiply them and find the exact amounts of the Blitz billing?

A.   Well, not exactly. It's not exact. What we do do is we have—so all of the minutes come from UQS.  It's a database that we have within our company. What we then have is RMS, a rate management system, that has rates that we load in for all of the different jurisdictions and so forth.

We do not actually rate and render our own bills. There's a third-party service bureau that does that, and there's mediation that happens at that service bureau. There's different rounding per call charges. There's a bunch of different things that happen. This is using our systems because it's the only way we can attribute it to specific phone numbers is our best estimate as to what the bill would be if we could render a bill.

Q.   Okay. And the [spreadsheet] that you provided for and attached to your declaration was your best—using that methodology for calculating the revenue billed estimate?

A.   Yes.

(Doc. 165-4, 100:11–104:13) (mistakes in original).  Regarding revenue collected, Mr. Lee further explained that Peerless often does not collect 100% of the amount it bills to a carrier because carriers will dispute certain charges.  (*Id.* at 104:14–105:3).  These disputes require Peerless to constantly amend its accounts, moving payments received from carriers from disputed charges to undisputed charges.  (*Id.* at 109:2–110:10, 111:15–112:7).  As a result, Mr. Lee again represents that the numbers produced in the spreadsheet for monthly revenues collected are not exact, but rather Peerless' best estimates.  (*See id.* at 112:8–18).

Similarly, in addition to the spreadsheet attached to Mr. Lee's sworn declaration disclosing the numbers vis-à-vis Peerless' entire network in response to topic 6, Mr. Lee testified as follows:

Q.   So looking at [the spreadsheet], was the calculations that were performed here, they are not indicating estimated revenue because this is across the entire Peerless network; is that correct?

A.   This is for the entire company, correct.

Q.  For the entire company, okay. So how were these columns calculated? Let's go through those the way we went through them before [for the Blitz spreadsheet].

A.  Okay. Just give me a second. So starting with column A, once again, it's by bill period. The nomenclature is the same . . . . So column A is all the billing periods through time.

Column B would be all minutes processed on our network across all products. So that would include all end-office termination, end-office origination, tandem-switched termination, tandem-switched origination, long distance, transit. Let me think if I'm missing anything. If I'm missing something, it's small because that should account for the minutes.

Q.  Was that done by database query?

A.  Yes, I obtained that from our IT department asking them to run all minutes by the requisite bill periods asked for.

Q.  How is then the revenue calculated?

A.  The revenue comes straight off of our accounting system; and that would basically be revenue booked in each one of these time periods per GAAP procedures; and that would be for every product that we sell.

Q.  So it would be accrued revenue for each of those periods?

A.  Yes, it would be accrued for all of the usage products that I just mentioned. It would be for colocation, it would be for TID phone numbers, it would be for lines, it would be for query dips, it would be for nonrecurring installations, it would be for our wireless product, it would be for installs and colocation too.

Q.  Was there any calculation that had to be done with regard to column C dealing with minutes of use broken out to different types times [sic] various rate structures for the various time periods as it had to have been done for [the Blitz spreadsheet]?

A.  It's a little bit different for the revenue that we book because it's an aggregate from our billing company. So when our billing company, who is InTech, we send all the records to them. They mediate, process and then create the invoices that go to the customers. Once that's done, we basically get an upload, basically a very huge file that has all this coding in it that is uploaded into our system that would have all of the revenue for each one of these periods for the usage.

. . . .

9

Q.    Did you also say that the revenue in column C included installations and other nonrecurring charges?

A.    Yeah, it's all revenue for the company.

Q.    Would nonrecurring charges be considered traffic?

A.    It's associated with traffic.

Q.    I understand associated with traffic, but would nonrecurring charges be traffic?

      . . . .

A.    Not necessarily.

      . . . .

Q.    If what's been attached to this deposition . . . includes nonrecurring charges, that would be some charges that are over and above what's been asked for with regard to traffic?

      . . . .

A.    [W]e read the request as being for all revenue that the company billed.

Q.    Column D deals with revenue collected. How is that calculated on the spread sheet?

A.    So this could have come from our—between InTech and our accounting system on payments received over time by time period.

Q.    Now, those payments received, is that more of a cash basis, this is when they were received; or is it applied to the accrual of the revenue that appears in column C?

A.    Column D, I believe, is when the cash was received in that period.

Q.    So it's not necessarily the cash received for the revenue booked in that period?

A.    Correct, because that is almost impossible to do on that basis.

      . . . .

      Our accounting system doesn't work in that way. We could maybe do it. I don't know right now. I can't answer that question right now.

      . . . .

> Column D represents the revenue collected during the time periods requested.

> Q. Right. And not the revenue collected based on the revenue billed in that time period?

> A. Correct.

(*Id.* at 140:8–148:7) (mistakes in original).

Plaintiffs wish to color Mr. Lee's testimony as unresponsive to topics 5 and 6. Specifically, Plaintiffs point to Mr. Lee's inability to identify exactly what each number in Peerless' spreadsheets consists of—for example, what proportion of each bill consisted of nonrecurring charges, what proportions of the revenues collected were actually collected in any given month, what proportions of the revenues billed were collected in which months, or which payments were allocated to which charges—and that Mr. Lee's ignorance on these aspects of the data demands that Peerless turn over all documents used to produce the spreadsheets.

However, the issues Plaintiffs now raise were not the subjects contemplated by topic 5, topic 6, or the parties' October 14, 2015 stipulation.  All Mr. Lee was asked to know for topic 5 was the amount of traffic that Blitz generated on Peerless's network, quantified in "minutes of use" and either "revenue billed," "revenue received," or "revenue collected."  Similarly, all topic 6 required Mr. Lee to know was the amount of traffic for the entire Peerless network, again quantified in "minutes of use" and either "revenue billed," "revenue received," or "revenue collected."  Mr. Lee's sworn declaration and the accompanying spreadsheets satisfied these requests, and Mr. Lee's deposition testimony competently answered the methods Peerless employed to arrive at the numbers displayed.

The fact that Mr. Lee could not answer with the exactitude Plaintiffs desired does not render him unknowledgeable or his testimony unresponsive.  *See QBE Ins. Co. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 688 (S.D. Fla. 2012) (holding that a corporation need only designate a person with knowledge on the topics of inquiry, not the person with the *most* knowledge).  Nor does Rule 30(b)(6) require Mr. Lee to remember every detail on the topics propounded.  *Id.* ("[T]he rule is not designed to be a memory contest . . . .").  All that is required is Peerless' conscientious and good faith preparation of Mr. Lee to be able to testify fully on the topics noticed.  *Id.*  Mr. Lee's candid admissions that the numbers produced were his best estimates does not lead the Court to conclude that Mr. Lee's testimony fell below this standard.

Moreover, Plaintiffs' objection to Mr. Lee's failure to bring documents with him to his deposition is unfounded.  Plaintiffs neither served Mr. Lee with a subpoena duces tecum nor identified the desired documents in the notice of deposition.  Similarly, assuming Plaintiffs previously asked for the documents through a request for production or another discovery mechanism, Plaintiffs never brought the issue before the Court.[1]  Consequently, Mr. Lee was not required to bring anything with him to the deposition except his knowledge as Peerless' corporate representative on the topics of inquiry.  Magistrate Judge Smith therefore did not clearly err when he denied Plaintiffs' requests to compel Peerless to produce documents.

## IV.   CONCLUSION

For the aforementioned reasons it is **ORDERED AND ADJUDGED** as follows:

1.  Plaintiffs' Objection to November 12, 2015 Order on Statement of Position on Orders and Stipulations of Record at the October 14, 2015 Hearing

---

[1]   The Court notes that the discovery period in this case closed on September 1, 2015.

(Doc. 165) is **OVERRULED**.

2. Plaintiffs' Objection to December 18, 2015 Order on Renewed Motion to Compel Corporate Representative Deposition Following Discovery Deadline (Doc. 181) is **OVERRULED**.

3. The Magistrate Judge's orders entered on November 12, 2015 (Doc. 165-3, 15:12–17:12) and December 18, 2015 (Doc. 176) are **AFFIRMED**.

**DONE AND ORDERED** in Orlando, Florida on February 2, 2016.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

The Honorable Magistrate Judge
Counsel of Record

13