**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

LOCAL ACCESS, LLC and BLITZ
TELECOM CONSULTING, LLC,

    Plaintiffs,

v.                                                                  Case No: 6:14-cv-399-Orl-40TBS

PEERLESS NETWORK, INC.,

    Defendant/Counter-Plaintiff,

v.

LOCAL ACCESS, LLC,

    Counter-Defendant.

## ORDER

This cause comes before the Court without oral argument on Defendant's Motion to Exclude Plaintiffs' Expert Testimony (Doc. 123), filed October 1, 2015. Plaintiffs responded in opposition on October 16, 2015. (Doc. 144). Upon consideration, Defendant's motion is denied.

**I.     BACKGROUND**

This dispute arises out of the deteriorated business relationship of Plaintiffs, Local Access, LLC ("Local Access") and Blitz Telecom Consulting, LLC ("Blitz"), and Defendant, Peerless Network, Inc. ("Peerless"). On November 9, 2010, Blitz and Peerless entered into an agreement wherein Peerless promised to provide certain telecommunications services to Blitz and its customers. In exchange, Blitz was responsible for generating and placing significant telecommunications traffic on Peerless's networks. In late 2011, Blitz's members started exploring the possibility of selling Blitz or a portion of its assets. To that

1

end, Blitz retained a brokerage firm to identify potential buyers and facilitate negotiations. At the same time, Blitz additionally informed certain parties with which it had prior business relationships, including Peerless, that it was considering selling its assets in order to gauge their interest. Although Peerless responded that it would indeed be interested, Peerless represented that it was not in the position at that time to consummate a deal.

Blitz's brokerage firm soon identified West Corporation ("West") as a potential buyer. After negotiations, West submitted a non-binding letter of interest to Blitz on May 11, 2012. In its letter of interest, West proposed an arrangement where it would purchase "all of [Blitz's] Telecommunications business"[1] for $8.5 million. According to Blitz, West later increased its offer to $9 million, which Blitz says it intended to accept. Upon learning of the possible deal, however, Peerless approached Blitz with an alternative arrangement. Peerless proposed that the members of Blitz should create a new entity—Local Access—and that Peerless would assign and refer all of its current and future prepaid calling card clients to Local Access in order to purchase call origination services. In exchange, Local Access would place all of the traffic generated from these clients on Peerless's networks for transit. Based on these representations, Blitz rejected West's proposal, accepted Peerless's offer, and Local Access was formed. Local Access and Peerless thereafter executed a Homing Tandem Agreement (the "Contract") which codified the terms of their relationship.

---

[1] The parties hotly dispute exactly what comprised the "Telecommunications business" identified in West's letter. Blitz maintains that West was only interested in buying a collection of customer contracts, while Peerless asserts that the deal contemplated the sale of the entire Blitz company.

According to Plaintiffs, however, Peerless stopped performing the Contract almost immediately after it was signed. Plaintiffs believe that Peerless never intended to follow through on its promises, but proposed the alternative arrangement as a ruse to prevent Blitz from selling its telecommunications business to West, which is one of Peerless's competitors. Plaintiffs filed this lawsuit as a result. Blitz sues Peerless for tortiously interfering with its pending deal with West and for fraudulently inducing it to make a business decision it never would have made but for Peerless's promises. Local Access sues Peerless for breaching the Contract and for fraudulently inducing it to enter into the Contract in the first place. As part of their damages, Blitz seeks to recover the money it would have made had it completed the deal with West, and Local Access seeks to recover the revenue it would have earned had Peerless performed the Contact as agreed.

To prove their damages at trial, Plaintiffs intend to call Stephen Gaines and Robert Russell as witnesses. Mr. Gaines is a financial advisor who Blitz retained to appraise the assets it would have sold to West had the parties finalized their deal. In his valuation report, Mr. Gaines opines that the assets were worth $7.3 million as of July 1, 2015, down from the $9 million allegedly offered by West. Mr. Russell is the President of both Blitz and Local Access and holds significant membership interests in each. Mr. Russell intends to testify about the financial information he provided to Mr. Gaines in furtherance of his valuation of the assets. Mr. Russell also intends to testify about the revenues Local Access has lost due to Peerless's failure to assign all of its prepaid calling card traffic to Local Access as required by the Contract. Peerless now moves to exclude both Mr. Gaines and Mr. Russell.

## II.  STANDARD OF REVIEW

The admission of expert evidence and testimony is governed by Federal Rule of Evidence 702 and the standards set forth by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny.  In essence, Rule 702 and the *Daubert* line of cases permit an expert to testify in the form of an opinion where three criteria are met: (1) the expert is qualified to offer the opinion he intends to offer, (2) the expert applied reliable methods and principles in forming his opinion, and (3) the expert's opinion will assist the jury in deciding a disputed fact or issue.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005), *cert. denied*, 546 U.S. 935 (2005). District courts are obligated to rigorously examine all three criteria in order to "'ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'"  *Id.* at 1291 (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)).  It is ultimately the burden of the party who offers the expert to show that the expert's opinion is admissible, and the party must do so by a preponderance of the evidence.  *Id.* at 1292.

## III. DISCUSSION

### A.  Qualifications

First, an expert must be "qualified to testify competently regarding the matters he intends to address."  *Id.* at 1291 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).  "[E]xperts may be qualified in various ways, including by . . . training, education, and experience."  *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260–61 (11th Cir. 2004)) (internal quotation marks omitted).  Other indicia of an expert's qualifications may include licenses held by the expert, publication in the pertinent field, and membership

in relevant professional societies. *See Ferrara & DiMercurio v. St. Paul Mercury Ins.*, 240 F.3d 1, 8 (1st Cir. 2001) (considering expert's licenses in assessing qualifications); *Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990) (considering expert's publications and membership in professional societies in assessing qualifications).

Peerless does not challenge Mr. Gaines' qualifications to assess and appraise business assets. Indeed, Mr. Gaines has earned degrees in economics and business administration, holds a number of active brokerage, trading, and banking licenses, has published two articles on the sale of business entities, and has over twenty years of financial advisory experience, including in the areas of divestitures, leveraged buyouts, and mergers and acquisitions. The Court therefore finds Mr. Gaines sufficiently qualified to competently testify in the area of business asset valuation.

**B.     Methodology**

Second, the methodology through which an expert reaches his opinion must be reliable. *Rink*, 400 F.3d at 1292. The reliability of an expert's methodology is examined by considering a wide range of factors, such as (1) whether the expert bases his opinion on appropriate facts or data, (2) the degree to which the expert's methodology is accepted within his profession, (3) whether the expert's methodology can be tested or verified, (4) whether standards exist which govern the expert's methodology and, if so, whether the expert adhered to those standards, (5) whether the expert considers or accounts for alternative or contradictory information, and (6) whether the expert exercises the same degree of care in applying the methodology that an expert in the field would exercise when conducting professional work outside the context of paid litigation. *See Daubert*, 509 U.S. at 593–94 (1993); Fed. R. Evid. 702 advisory committee's note to 2000 amendments. Importantly, when evaluating an expert's methodology, it is not for the court

to determine the accuracy or correctness of the conclusions reached; instead, the court focuses solely on the propriety of the methods and principles the expert used in forming his conclusions. *Rosenfield v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011). Indeed, cross-examination, presentation of contrary evidence, and instruction on the burden of proof, rather than exclusion, are the appropriate tools for challenging disputed expert evidence. *Id.*

In this case, Mr. Gaines appraised the assets which were the subject of West's letter of interest by utilizing the discounted cash flow method. Mr. Gaines explains that the discounted cash flow method essentially estimates the fair market value of the assets by considering both the present value of the assets' current cash flow and the present value of the assets' anticipated future cash flow. (Gaines Report p. 3).[2] As to the assets' current cash flow, Mr. Gaines used financial data provided by Blitz which reflected the revenues and expenses associated with the assets for the first quarter of 2015. (*See* Docs. 123-7, 123-8). As to the present value of the assets' future cash flow, Mr. Gaines utilized the same data to project the amount of revenues the assets could be expected to return for the remainder of 2015 and for each year from 2016 through 2039.[3] (Gaines Report pp. 3–4). Mr. Gaines then applied a discount rate of 21.6% to reduce these projected revenues to present value. (*Id.* at p. 4). Mr. Gaines explains that he arrived at a 21.6% discount rate by evaluating Blitz's cost of debt and cost of equity and weighting these two elements according to Blitz's overall capitalization. (*Id.* at pp. 4–7, 12).

---

[2] Mr. Gaines' expert report is located at Docket Entry 123-1.
[3] Mr. Gaines projected future revenues through 2039 because that is the year in which Blitz's management, assuming a negative 3.1% annual decline in revenues, expect the value of the assets to reach zero. (Gaines Report pp. 4, 7).

6

Peerless attacks Mr. Gaines' methodology for two reasons. Peerless first asserts that the discounted cash flow method is not an appropriate valuation method for the assets at issue in this case. Peerless specifically contends that the discounted cash flow method is only appropriate in situations where historical earnings and cash flow data cannot be relied on because of the changing and uncertain nature of the subject business's financial circumstances. Peerless posits that Blitz does not fit this mold and that the only reason Mr. Gaines resorts to the discounted cash flow method is because Blitz did not produce sufficient financial information for Mr. Gaines to review.

Here, Mr. Gaines explains in his report that he selected the discounted cash flow method from among five potential valuation methods because it is the more sophisticated measure of fair market value and is capable of accounting for varying rates of growth, which a company like Blitz is likely to experience. (Gaines Report pp. 2–3). Moreover, many federal courts—including the Eleventh Circuit—have recognized the discounted cash flow method as a viable method for determining the fair market value of a business or asset. *See, e.g.*, *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1075–76 (11th Cir. 2015) (affirming bankruptcy court's use of discounted cash flow method to valuate Chapter 11 debtor); *Matrix Grp., Ltd. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 594 (8th Cir. 2007) (referring to the discounted cash flow method as "the preeminent valuation methodology in the financial community") (citation and internal quotation marks omitted); *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 447–48 (3d Cir. 2002) (collecting cases approving of the discounted cash flow method to determine the fair market value of a business or asset). Indeed, even Peerless's own valuation expert, William H. Frazier, utilizes the discounted cash flow method to arrive at his own appraisal of Blitz's assets.

(Doc. 123-5, Ex. D). The Court therefore rejects Peerless's argument that the discounted cash flow method is improper.

Peerless also claims that even if the discounted cash flow method were a proper valuation method, Mr. Gaines applied it incorrectly in this case. In support, Peerless points to Mr. Frazier's competing expert report in which he itemizes his concerns with Mr. Gaines' application of the discounted cash flow method. Mr. Frazier primarily focuses on what he considers a lack of adequate financial information available to Mr. Gaines in making his calculations. (*Id.* at pp. 8–10). Mr. Frazier additionally disputes the propriety of certain assumptions Mr. Gaines makes in his application of the discounted cash flow method and contends that these assumptions are not reasonable for a company like Blitz. (*Id.* at pp. 12–13).

Peerless's position, however, is insufficient to warrant excluding Mr. Gaines' testimony. According to the Eleventh Circuit, the discounted cash flow method broadly consists of four components: "(1) estimated earning capacity; (2) cash flow adjustments to the earning capacity; (3) a discount rate to discount future cash flow to present value; and (4) a long-term growth rate to reflect growth in earnings and cash flow beyond the end of the forecast period." *Cox Enters., Inc. v. News-Journal Corp.*, 510 F.3d 1350, 1355 (11th Cir. 2007). A review of Mr. Gaines' report reveals that he did, in fact, account for all four components in his analysis. (*See* Gaines Report pp. 3–7). Further, Mr. Gaines justifies the basis for each assumption he makes and identifies the financial information and data on which he relies in forming his conclusions. To the extent Peerless believes that Mr. Gaines' assumptions are inappropriate or based on insufficient information, these contentions are best tested through cross-examination and contrary evidence. *See Rosenfield*, 654 F.3d at 1193.

Overall, the Court finds Mr. Gaines' methodology to be sufficiently reliable. Mr. Gaines indicates that he considered alternative valuation methods and explains why he selected the discounted cash flow method for this particular case. Moreover, the discounted cash flow method is firmly accepted within the financial community for appraising assets like those involved here. Additionally, Mr. Gaines' application of the discounted cash flow method is based on identifiable financial information and data which can be tested and verified. The Court will therefore not exclude Mr. Gaines' testimony as unreliable.

### C.   Assistance to the Jury

Third, an expert must assist the jury to "understand the evidence or to determine a fact in issue." *Rink*, 400 F.3d at 1292 (quoting *City of Tuscaloosa*, 158 F.3d at 562). An expert will assist the jury when his testimony concerns matters beyond the knowledge or experience of the average juror. *Frazier*, 387 F.3d at 1262. Conversely, there will be no need for an expert's opinion where the jury can decide a disputed issue through the application of common sense or simple logic in light of the evidence and testimony presented at trial. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). Further, like all evidence and testimony, an expert's opinion must be relevant to an issue in the case and must have probative value that outweighs the concerns identified by Rule 403. *Daubert*, 509 U.S. at 595.

Peerless contends that Mr. Gaines' proposed testimony is not helpful to the jury because his valuations of the Blitz assets in 2012 and 2015 are based on different data. However, Peerless misunderstands the nature of Mr. Gaines' opinion. Although Mr. Gaines references the $8.5 million letter of interest from West and the alleged $9 million revision, Mr. Gaines offers no opinion as to the value of the assets in 2012 or whether

either of West's purported offers were accurate estimations of the assets' combined fair market value. Rather, Mr. Gaines solely opines as to the value of the assets as of July 1, 2015, and notices that this number is $1.7 million less than West's $9 million offer. (Gaines Report p. 7). It will ultimately be for the jury to decide whether West offered $8.5 million, $9 million, some other number, or no number at all for the assets. Nevertheless, Mr. Gaines' appraisal of the assets will assist the jury in determining Blitz's measure of damages should it prevail—*i.e.*, how much value the assets lost due to Blitz's decision to forgo the deal with West. Since damages are an essential element of both of Blitz's claims, and because appraising the value of business assets is beyond the knowledge and experience of the average juror, Mr. Gaines' testimony proves helpful.

### D. Robert Russell's Testimony on Damages

Lastly, Peerless moves to exclude the testimony of Blitz's and Local Access's President, Robert Russell. Mr. Russell intends to testify about the financial information he provided to Mr. Gaines in furtherance of his valuation of Blitz's assets and also about the amount of revenues Local Access has lost due to Peerless's breach of the Contract. Peerless moves to exclude Mr. Russell's testimony on the grounds that he was never disclosed as a damages expert and that, even if he had been, he is no expert on the topics he intends to discuss.

However, it is well-settled that the owner or manager of a business need not be qualified as an expert to testify about the value of the business, its assets, or its revenues so long as his proffered testimony falls within the scope of his experience and management of the business. *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1469 (11th Cir. 1989); *see also* Fed. R. Evid. 701 advisory committee's note to 2000 amendments ("[M]ost courts have permitted the owner or officer of a business to testify to the value of

projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert."). Peerless does not contend that the testimony Mr. Russell intends to offer falls outside the scope of his position as President of either Blitz or Local Access. Nor could it, as it appears that Mr. Russell played an active role in the negotiations which form the basis of Blitz's claims against Peerless, (*see* Doc. 141-2), and was the officer who executed the Contract on Local Access's behalf, (Doc. 4, Ex. B). Instead, Peerless quarrels with the foundation and accuracy of Mr. Russell's estimation of damages, both of which may be properly addressed through means other than exclusion.

### IV.   CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** that Defendant's Motion to Exclude Plaintiffs' Expert Testimony (Doc. 123) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on August 24, 2016.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record