**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

LOCAL ACCESS, LLC and BLITZ
TELECOM CONSULTING, LLC,

      Plaintiffs,

v.                                             Case No:  6:14-cv-399-Orl-40TBS

PEERLESS NETWORK, INC.,

      Defendant/Counter-Plaintiff,

v.

LOCAL ACCESS, LLC,

      Counter-Defendant.

_____

**<u>ORDER</u>**

This cause comes before the Court without oral argument on the following:

1.  Plaintiffs' Motion for Partial Summary Judgment (Doc. 122), filed October 1, 2015;

2.  Defendant's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Doc. 145), filed October 19, 2015;

3.  Defendant's Motion and Memorandum in Support of Summary Judgment on Counts I Through IV (Doc. 124; Sealed Doc. 136), filed October 1, 2015;

4.  Plaintiffs' Response in Opposition to Defendant's Motion and Memorandum in Support of Summary Judgment on Counts I–IV (Doc. 141), filed October 15, 2015;

5.  Defendant's Supplemental Brief in Support of Motion for Summary Judgment (Doc. 253), filed August 24, 2016; and

6. Plaintiffs' Response to Defendant's Supplemental Brief in Support of Motion

for Summary Judgment (Doc. 254), filed September 3, 2016.

Upon consideration and review of the record, including all pleadings, deposition transcripts, affidavits, exhibits, and memoranda of the respective parties, the Court denies both motions.

## I.   BACKGROUND

By way of introduction, the parties in this case all operate within the telecommunications industry.  Plaintiff, Blitz Telecom Consulting, LLC ("Blitz"), purchases telephone numbers from various telecommunications carriers (such as local and long distance providers) and subsequently markets and resells those numbers in bulk, along with other associated services, to companies and telecommunications carriers who then offer telephone services to end consumers at a discounted price.  Plaintiff, Local Access, LLC ("Local Access"), and Defendant, Peerless Network, Inc. ("Peerless"), are both Competitive Local Exchange Carriers, which are essentially telephone companies that provide local telephone and other telecommunications services directly to end consumers.

This lawsuit represents the second chapter in what has proved to be a challenging business relationship between Blitz and Peerless.  The first chapter opened in November 2010, when Blitz and Peerless entered into a contract whereby Blitz agreed to place certain telecommunications traffic on Peerless's networks in exchange for Peerless paying Blitz a commission based on the volume of traffic Blitz placed.  *See Blitz Telecom Consulting, LLC v. Peerless Network, Inc.*, 151 F. Supp. 3d 1294, 1299–1300 (M.D. Fla. 2015).  Peerless subsequently stopped paying commissions to Blitz, however, and Blitz

sued.  The chapter ended (at least in this Court) on March 9, 2016, when a jury returned a verdict in Blitz's favor and awarded over $2.3 million in damages.

This second chapter begins in late 2011, when the members of Blitz began exploring the possibility of selling Blitz or a portion of its assets.  To that end, Blitz retained a brokerage firm to identify potential buyers and facilitate negotiations.  The brokerage firm soon identified West Corporation ("West") as a potential buyer and, after negotiations, West submitted a non-binding letter of interest to Blitz on May 11, 2012 (hereinafter referred to as the "Letter of Interest").  In the Letter of Interest, West offered to purchase "all of [Blitz's] Telecommunications business"[1] for $8.5 million.  (Doc. 124-3).  According to Blitz, West later increased its offer to $9 million.

Blitz and West never consummated a deal, however, although the parties disagree as to why.  Peerless contends that Blitz found West's offer far too low.  Conversely, Blitz asserts that it would have accepted West's offer, but that it was Peerless which convinced it otherwise.  Specifically, Blitz states that Peerless proposed an alternative arrangement where Blitz would create a new entity—Local Access—and that Peerless would assign and refer to Local Access all current and future prepaid calling card clients who wished to purchase certain telephone services.  In exchange, Local Access would place all traffic it generated from prepaid calling card clients on Peerless's networks for transit.  Blitz alleges that it was this business proposal which caused it to abandon the deal with West.

---

[1]   The parties hotly dispute exactly what comprised the "Telecommunications business" identified in West's Letter of Interest.  Blitz maintains that West was only interested in buying a collection of customer contracts, while Peerless asserts that the deal contemplated the sale of the entire Blitz company.

In any event, Blitz's members rejected West's offer on May 22, 2012 and formed Local Access soon thereafter.  On June 1, 2012, Local Access and Peerless executed a Homing Tandem Agreement (hereinafter referred to as the "Contract") which, at least in part, codified the terms Blitz says caused it to reject West's offer.  Important to this case is Section 7, titled "Non-Competition," which provides as follows:

> 7.1   Peerless – Peerless will assign or refer all Prepaid Calling Card Clients, now or at anytime [sic] during the term, that desire to purchase Local Origination Services to [Local Access]. [Local Access] will be the sole and exclusive provider of Local Origination Services to all Prepaid Calling Card business through Peerless. [Local Access] shall have the sole authority to negotiate pricing and terms with Prepaid Calling Card clients.

> 7.2   [Local Access] – All traffic placed by Prepaid Calling Card clients with [Local Access] that falls within the Peerless network footprint will be provisioned by [Local Access] on the Peerless network. This includes any Prepaid Calling Card clients that contract with [Local Access] whether or not Peerless refers them to [Local Access]. Additionally, [Local Access] will refer all clients seeking transit services to Peerless and [Local Access] will not enter the Transit Service market within the Peerless network footprint during the term of this Agreement. Peerless will be the sole and exclusive provider of Transit Services in the Peerless footprint.

(Contract § 7).[2]

According to Plaintiffs, however, Peerless breached the Contract almost immediately after it was signed by failing to refer or assign to Local Access prepaid calling card clients who wished to purchase the services contemplated by Section 7.1.  Plaintiffs now believe that Peerless never actually intended to follow through on its promises, but proposed the alternative arrangement as a ruse to prevent Blitz from completing the deal

---

[2]   The Contract is located at Docket Entry 124-11.

with West, which is one of Peerless's competitors.   Peerless denies Plaintiffs' accusations.

Plaintiffs filed this lawsuit on March 12, 2014.  Blitz sues Peerless for tortiously interfering with its deal with West and for fraudulently inducing it to make a business decision it never would have made but for Peerless's promises.  Local Access sues Peerless for breaching the Contract and for fraudulently inducing it to enter into the Contract in the first place.[3]  Now before the Court are the parties' respective summary judgment motions.

## II.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials," but may also consider any other material in the record.  Fed. R. Civ. P. 56(c)(3).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*  The moving party bears the initial burden of identifying those portions of the record

---

[3]   Peerless additionally countersues Local Access to recover the value of certain services it provided under the Contract.  However, Peerless's counterclaims are not pertinent to the instant Order.

demonstrating a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).   If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Celotex*, 477 U.S. at 331; *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).   In determining whether a genuine dispute of material fact exists, the court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor.   *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).   Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III.   DISCUSSION

Local Access moves for partial summary judgment on a particular aspect of its breach of contract claim against Peerless and Peerless moves for summary judgment on all of Plaintiffs' claims against it.   The Court addresses the issues raised by the parties' respective motions in the most logical order.

**A.      Local Access's Motion for Partial Summary Judgment**

In its Motion for Partial Summary Judgment, Local Access asks the Court to determine what Peerless's duty was under the Contract relative to assigning or referring prepaid calling card clients.  Due to a choice of law provision in the Contract, the Court applies Illinois law in answering Local Access's question.[4]  (*See* Contract § 12).

As part of prevailing on a breach of contract claim under Illinois law, the plaintiff must prove that the defendant breached a contractual duty.  *See Kopley Grp. V., L.P. v. Sheridan Edgewater Props., Ltd.*, 876 N.E.2d 218, 226 (Ill. App. Ct. 2007).  "The question of whether a duty has been breached is a factual one, left to the trier of fact to resolve." *Frederick v. Prof'l Truck Driver Training Sch., Inc.*, 765 N.E.2d 1143, 1148 (Ill. App. Ct. 2002) (quoting *Fillpot v. Midway Airlines, Inc.*, 633 N.E.2d 237, 240 (Ill. App. Ct. 1994)). However, whether a contractual duty exists in the first place is a question of law which the trial court may resolve by summary judgment.  *Id.*

Here, Local Access moves the Court to decide as a matter of law that Peerless had a duty under the Contract "to assign or refer to Local Access all Prepaid Calling Card clients that wanted to purchase local phone numbers."  (Doc. 122, p. 15).  Local Access posits that this duty arises under Section 7.1 of the Contract, which states that "Peerless will assign or refer all Prepaid Calling Card clients, now or at anytime [sic] during the term, that desire to purchase Local Origination Services."  (Contract § 7.1).  Local Access equates the term "Local Origination Services" with "local phone numbers" and asks the Court to do the same.  Therefore, Local Access's motion essentially requires the Court to

---

[4]    Local Access and Peerless agree that the Contract's choice of law clause is valid and enforceable and governs Local Access's breach of contract claim against Peerless.

interpret the term "Local Origination Services" in resolving whether Peerless owed the duty Local Access asserts.

In interpreting and applying the terms of a contract, the Court's first inquiry is whether the disputed contractual provision is ambiguous, an inquiry which is resolved as a matter of law. *See Berryman Transfer & Storage Co. v. New Prime, Inc.*, 802 N.E.2d 1285, 1287 (Ill. App. Ct. 2004). A contract is ambiguous "when the language used is susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression." *Shields Pork Plus, Inc. v. Swiss Valley Ag Serv.*, 767 N.E.2d 945, 949 (Ill. App. Ct. 2002) (citations and internal quotation marks omitted). On the other hand, a contract is unambiguous where the court is able to discern the parties' intent from the plain and obvious meaning of the contract's language. *See MXL Indus., Inc. v. Mulder*, 623 N.E.2d 369, 376–77 (Ill. App. Ct. 1993). If a contract is found to be ambiguous, its proper interpretation is a question of fact reserved for the jury. *See Shields Pork*, 767 N.E.2d at 949. However, where a contract is unambiguous, the court simply enforces the parties' intent based on the plain and obvious meaning of the words used. *MXL Indus.*, 623 N.E.2d at 376–77.

Local Access contends that Section 7.1 and the term "Local Origination Services" are unambiguous. In its motion, Local Access argues that the terms "origination" and "origination services" embrace well-established concepts within the telecommunications industry concerning how a telephone call is initiated:

> When a telephone call is made, it "originates" with the person making the call. The caller's carrier is the "originating" carrier. The call is then connected, directly or indirectly, to the carrier for the person whose phone number has been dialed. That is where the call "terminates." Thus, "Origination" is the commencement of a call. In turn, "Origination services" would

be services necessary to allow a person to "originate" a call,
including the provision of a phone number.

(Doc. 122, p. 7).  Local Access produces no expert evidence or relevant industry literature to support its position, but relies solely on deposition testimony elicited from Peerless's corporate representative who stated that he understands the term "origination services" to hold a special industry meaning.  (Doc. 145-2, 66:1–6).  Local Access then applies what it considers the plain meaning of the word "local" as a modifier to distinguish between calls which are initiated locally—i.e., within the caller's area code—from long distance and toll free calls which are not.  Local Access concludes that the term "Local Origination Services" in Section 7.1 of the Contract must therefore encompass the service of providing local telephone numbers for origination.

In response, Peerless submits that Local Access's understanding of "origination" and "origination services" is not entirely accurate.  Peerless states the Local Access mischaracterizes the provision of telephone numbers to a customer by a carrier as involving purely origination.  According to Peerless, it is the type of service being provided and the role of the carrier which determines whether the provision of a telephone number involves origination or termination.  Where a carrier provides a telephone number to a customer for the purpose of initiating a call, that service involves origination; where a carrier provides a telephone number to a customer for the purpose of receiving calls, that service involves termination.  Peerless consequently concludes that Local Access's proposed definition of "Local Origination Services" cannot be right.

The record on summary judgment reveals just how much confusion and disagreement surrounds the term.  At his deposition as Peerless's Executive Vice President of Sales and Marketing, Richard Knight repeatedly testified that "Local

Origination Services" means different things in different contexts and that the term "Local Origination Services" in the context of the Contract only relates to transit services for telephone calls, as opposed to origination services:

> Q.   If Peerless was providing—if I called it local origination services—
>
> A.   Right.
>
> Q.   —is that a term that you would understand?
>
> A.   It depends on what content [sic] it was being used in.
>
> Q.   Can you please explain?
>
> A.   Well, in the DID market under IP control, it's used for the origination of DID numbers.
>
> Q.   Is there any other context where the use of the term would be relevant?
>
> . . . .
>
> A.   Well, you have local origination that [Peerless] used for a while from a transit perspective. That's transit between carriers.
>
> . . . .
>
> Q.   Does Peerless provide local origination services . . . for the benefit of Local Access pursuant to the contract between Local Access and Peerless?
>
> A.   Local origination in terms of transit traffic to them, yes.
>
> Q.   What does that mean? Again, I'm the neophyte in this area. Could you explain what is meant in terms of the local origination services in terms of tandem traffic?
>
> A.   Sure. What that is is it's local traffic transiting through the network from one [Competitive Local Exchange Carrier] entity to another, utilizing our local tandem.
>
> . . . .

> Q. We went through the definitions of local origination at the beginning of the deposition.
>
> A. Right, and there was—there's different definitions for different products.

(Doc. 145-1, 47:20–48:14, 52:3–17, 167:1–4) (objections omitted). Mr. Knight also confirmed this understanding of the term "Local Origination Services" in his capacity as Peerless's corporate representative. (*See* Sealed Doc. 130-2, 66:7–69:22, 100:21–101:10, 106:3–107:3).

Perhaps most striking are the differing definitions given by Local Access's own agents and representatives. For example, Local Access's President, Robert Russell, initially could not define "Local Origination Services" at his disposition:

> Q. What did you intend the definition of Local Origination Service to be?
>
> A. I didn't have any intentions. What does local origination service mean? I know what it means to me.
>
> Q. What did you intend the contract to have it be defined as?
>
> A. I don't think I put it in there.

(Doc. 130-4, 171:23–172:5). Mr. Russell later testified, however, that he considers the term "Local Origination Services" to include origination, termination, and "any and all services" which a prepaid calling card client might want to purchase. (*See* Doc. 130-4, 200:3–204:1). Not only does this description of "Local Origination Services" vary drastically from Peerless's, it directly contradicts the definition Local Access asks the Court to adopt in its Motion for Partial Summary Judgment.

Further adding to this fog is a section of the Contract titled "Definitions and Recitals," in which Peerless and Local Access listed the term "Local Origination Services," but provided no definition.  (Contract § 1.11).  It therefore appears on the face of the Contract that the parties intended to afford a unique meaning to the term.  Local Access attempts to rebut this inference by pointing to the introductory language of the section which states that "[a]ny terms not defined in this Agreement or in Peerless' Access Tariffs shall have the same meanings as used by regulatory commissions and the telecommunications industry in general."  (Contract § 1).  However, Local Access produces no evidence or authority indicating what "Local Origination Services" means under the pertinent regulatory commissions or within the telecommunications industry.

In short, the meaning of "Local Origination Services" as contemplated by the Contract is entirely unclear; as a result, the Court finds Section 7.1 to be ambiguous. Accordingly, the true meaning of the term must be left for the jury to decide.  Local Access's Motion for Partial Summary Judgment will therefore be denied.

### B.    Peerless's Motion for Summary Judgment

#### 1.    Local Access's Breach of Contract Claim

Peerless moves for summary judgment on Local Access's breach of contract claim for two reasons.  First, Peerless contends that the provision of the Contract that Local Access alleges Peerless breached is an unenforceable noncompetition agreement. Second, Peerless asserts that, due to a limitation of liability clause within the Contract, Local Access disclaimed any damages arising from Peerless's alleged breach.  The Court addresses Peerless's arguments in turn.

### a.    The Noncompetition Agreement

Illinois courts generally disfavor noncompetition agreements because they hamper competition in the marketplace and restrict others from pursuing gainful employment or business opportunities.  *See Reliable Fire Equip. Co v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011).   Nevertheless, a noncompetition agreement contained within a contract is enforceable where (1) the agreement is ancillary to the main purpose of the contract, (2) the agreement is supported by adequate consideration, and (3) the agreement is reasonable in scope.  *McInnis v. OAG Motorcycle Ventures, Inc.*, 35 N.E.3d 1076, 1082 (Ill. App. Ct. 2015), *appeal denied*, 39 N.E.3d 1003 (Ill. 2015).  Whether a noncompetition agreement is enforceable is a question of law.  *Id.*

The noncompetition agreement at issue in this case provides as follows:

> Peerless – Peerless will assign or refer all Prepaid Calling Card Clients, now or at anytime [sic] during the term, that desire to purchase Local Origination Services to [Local Access]. [Local Access] will be the sole and exclusive provider of Local Origination Services to all Prepaid Calling Card business through Peerless. [Local Access] shall have the sole authority to negotiate pricing and terms with Prepaid Calling Card clients.

(Contract § 7.1).  Peerless claims that this agreement is unenforceable because it is not ancillary to the Contract and is unreasonable in scope.

A noncompetition agreement is ancillary to the underlying contract when it is subordinate to or distinct from the primary purpose of the contract, *see Abel v. Fox*, 654 N.E.2d 591, 595–96 (Ill. App. Ct. 1995), or when the objective of noncompetition is to protect the parties' purpose for entering into the contract in the first place, *see Hamer Holding Grp., Inc. v. Elmore*, 560 N.E.2d 907, 916 (Ill. App. Ct. 1990).   Conversely, a noncompetition agreement is not ancillary to a contract—and is therefore

unenforceable—when it consists of nothing more than a "naked promise" the sole purpose of which is to restrain trade. *Creative Entm't, Inc. v. Lorenz*, 638 N.E.2d 217, 222 (Ill. App. Ct. 1994).

The Court finds the noncompetition agreement in this case to be ancillary to the Contract. Although Peerless views the agreement as the primary purpose of the Contract, a plain reading of the Contract as a whole reveals to the contrary. For example, the introductory recitals to the Contract decree that the parties executed the Contract for the purpose of Peerless providing "homing tandem services" to Local Access and to define the parties' rights and obligations relative to Peerless's provision of those services. (Contract, p. 2). The Contract then goes on to detail how Peerless will provide homing tandem services to Local Access and how much Local Access will pay Peerless for using these services. (Contract §§ 5, 6, Addendum I). As explained by Peerless's corporate representative, homing tandem services are a type of intermediary service that originating carriers like Local Access might use to route telephone traffic to terminating carriers who will then connect the telephone call to the end consumer. (Sealed Doc. 130-2, 72:4–9, 73:16–24). Peerless's corporate representative additionally confirmed that the entire purpose of the Contract was to provide this type of service to Local Access so that Peerless could essentially act as a hub for routing all traffic Local Access generated. (*Id.* at 72:23–73:4).

In contrast, the noncompetition agreement is subordinate to the main purpose of the Contract. Indeed, the noncompetition agreement itself says that Peerless will assign or refer a subset of its telecommunications clients—prepaid calling card clients—to Local Access so that Local Access can provide origination services to those clients. (Contract

§ 7.1).  Local Access will then generate traffic from those and other clients and place all traffic on Peerless's network so that Peerless can transit the traffic to terminating carriers. (Contract § 7.2).  Peerless charges both Local Access for the privilege of porting the traffic it generates with Peerless, (Contract § 6), and the prepaid calling card clients for the transit services it provides by transmitting their calls to terminating carriers, (Contract § 7.2).  In sum, this arrangement only concerns Local Access's provision of origination services to prepaid calling card clients, while the Contract as a whole contemplates Peerless providing a host of other services for all telecommunications traffic generated by Local Access.  Peerless's corporate representative again confirmed as much at his deposition.  (*See* Sealed Doc. 130-2, 118:2–124:21).  The noncompetition agreement in this case is therefore ancillary to the Contract in that it is not a mere "naked promise" to restrain Peerless's provision of services, but operates to enable Peerless to engage in a mutually beneficial relationship with Local Access.[5]

As to Peerless's second argument, the reasonableness of a noncompetition agreement depends heavily on the facts and circumstances of each case, although three overarching principles guide the inquiry: (1) the agreement must not be greater than necessary to protect the promisee's legitimate interests, (2) the agreement must not unduly oppress the promisor, and (3) the agreement must not injure the general public. *See Reliable Fire*, 965 N.E.2d at 396.  To that end, Illinois courts frequently find the reasonableness of a noncompetition agreement to turn on factors such as temporal

---

[5]  Although Peerless does not raise the issue of consideration, the Court finds that the parties' mutually beneficial relationship arising from the promises exchanged in Sections 7.1 and 7.2 constitute adequate consideration to support the noncompetition agreement.

scope, the extent of geographic restrictions, and the degree of conduct prohibited.  *Id.* at 396–97; *see also, e.g.*, *Lawrence & Allen, Inc. v. Cambridge Human Res. Grp., Inc.*, 685 N.E.2d 434, 442–43 (Ill. App. Ct. 1997) (refusing to enforce noncompetition agreement which prohibited employee from directly or indirectly participating in employer's business within the territorial United States for a period of two years after termination of employment); *Decker, Berta & Co. v. Berta*, 587 N.E.2d 72, 76–77 (Ill. App. Ct. 1992) (finding noncompetition agreement reasonable where employee promised not to compete within thirty-five mile radius of employer for a period of three years after termination of employment).  Further, Illinois courts apply a more lenient review of noncompetition agreements where the contracting parties enjoyed relatively equal bargaining power.  *Cf. Arcor, Inc. v. Haas*, 842 N.E.2d 265, 272–73 (Ill. App. Ct. 2005) (distinguishing between noncompetition agreements contained within employment contracts, which require "a more stringent test of reasonableness," from noncompetition agreements contained within business contracts, which are not as strictly reviewed).

The Court finds the noncompetition agreement in this case reasonable.  To begin, Peerless and Local Access are sophisticated telecommunications companies managed by seasoned professionals; the parties therefore enjoyed comparable bargaining power when negotiating both the noncompetition agreement and the Contract as a whole. Further, Peerless's obligation not to compete is reasonably limited to a narrow and specific category of activity: providing origination services to prepaid calling card clients. Peerless is free to provide other telecommunications services, including origination services not emanating from prepaid calling cards.  The temporal scope of the agreement is also reasonable, as Peerless is only proscribed from providing origination services to

prepaid calling card clients for the term of the Contract, which consists of an initial five-year term followed by one-year renewal terms subject to either party's right to terminate the Contract.  (Contract §§ 3.1, 3.2).  Moreover, as discussed in more detail above, Peerless's promise not to compete is not entirely to Peerless's detriment.  While Peerless agrees to forego providing origination services to prepaid calling card clients and the revenues which accompany providing those services, Peerless reaps the benefits of being the exclusive provider of transit services for all traffic Local Access generates.

Finally, Peerless's argument that the noncompetition agreement violates federal telecommunications laws and is thus injurious to the public is unfounded.  Peerless bases its claim on its status as a common carrier under federal law, which mandates that Peerless provide its telecommunications services to all members of the public who wish to purchase those services from Peerless.  *See* 47 U.S.C. §§ 201(a), 202(a).  Peerless therefore reasons that its noncompetition agreement with Local Access, by requiring Peerless to decline providing origination services to prepaid calling card clients, violates those clients' federal rights to purchase origination services from Peerless.  However, Peerless's position appears to be foreclosed by the deposition testimony of its corporate representative, who testified that it was Peerless's intent to no longer offer origination services to prepaid calling card clients and that this was the impetus for agreeing not to compete with Local Access.  (Sealed Doc. 130-2, 118:2–23, 130:23–131:23).  Peerless has cited, and the Court has encountered, no legal authority supporting the notion that federal law requires a telecommunications company to provide a particular type of telecommunications service, regardless of whether the company offers or is even capable

of providing that service, simply because a member of the public asks for it.  Accordingly, the Court finds that the noncompetition agreement is not injurious to the public.

In sum, the Court concludes that the noncompetition agreement is ancillary to the Contract, is supported by adequate consideration, and is reasonable in scope, thus preventing summary judgment on the basis that it is unenforceable.

### b.    The Limitation of Liability Clause

In Section 8 of the Contract, titled "No Consequential Damages, Liabilities or Warranties," the parties agreed as follows:

> Limitation of Liability – In no event shall either party be liable for any indirect, incidental, special, consequential, punitive, reliance, or cover damages, including loss of profits, revenue, data, or use, incurred by either party or any third party, even if that party has been advised of the possibility of such damages.

(Contract § 8.2).  Peerless argues that the only damages Local Access seeks in this case are lost revenues emanating from the prepaid calling card traffic Peerless failed to assign or refer.  (*See* Doc. 4, ¶¶ 34, 37).  Peerless characterizes these lost revenues as consequential damages which are barred according to the above limitation of liability clause.  As a result, Peerless concludes that Local Access cannot recover the damages it asserts and that this fact proves fatal to Local Access's breach of contract claim.

It is certainly true that, without proof of damages, a plaintiff cannot prevail on a breach of contract claim.  *Westlake Fin. Grp., Inc. v. CDH-Delnor Health Sys.*, 25 N.E.3d 1166, 1174 (Ill. App. Ct. 2015).  Regarding contract damages, Illinois courts distinguish between "direct damages" and "consequential damages."  "'Direct damages' . . . are '[d]amages that the law presumes follow the type of wrong complained of.'"  *Id.* (quoting Black's Law Dictionary 394 (7th ed. 1999)).  On the other hand, "'[c]onsequential

damages' are losses or injuries that do not flow directly and immediately from a party's wrongful act but rather result indirectly from the act." *Id.* The characterization of damages as direct or consequential turns not on the type of damages alleged—*i.e.*, personal injury, lost wages, mental anguish—but on the nature of the damages in relation to the breach. *See id.* at 1175 (observing that lost profits can be characterized as either direct or consequential damages, "depending on the situation").

Here, Local Access claims that Peerless breached the Contract by failing to assign or refer prepaid calling card clients who desired to purchase origination services. As a result, Local Access seeks to recover the revenues it would have earned from these clients had Peerless held up its end of the bargain. There should be no doubt that lost revenues are the type of damages one would normally associate as directly flowing from a broken promise to assign clients who would have supplied those revenues. Local Access's claim of lost revenue damages therefore constitutes direct damages which are not barred by the Contract's limitation of liability clause.

### 2.    Blitz's Tortious Interference Claim

Next, Peerless moves for summary judgment on Blitz's tortious interference claim. In that claim, Blitz alleges that Peerless interfered with its business relationship with West by proposing an alternative arrangement involving Local Access, which then led Blitz to reject West's offer to purchase certain of Blitz's assets. Peerless moves for summary judgment on the basis that Blitz's relationship with West was not sufficiently definite to sustain a cause of action.

To prevail on a claim for tortious interference with a business relationship in Florida,[6] the plaintiff must prove four elements: (1) the existence of a business relationship between the plaintiff and a third party, (2) the defendant's knowledge of the relationship, (3) the defendant's intentional and unjustified interference with the relationship, and (4) damages as a result of the defendant's interference. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994). As to the first element, "[a] protected business relationship need not be evidenced by an enforceable contract." *Id.* However, the business relationship must at least afford existing or prospective legal rights to the parties and embody "an actual and identifiable understanding . . . which in all probability would have been completed if the defendant had not interfered. *Id.* at 814–15.

Generally, a mere offer to buy or a proposal to initiate negotiations is not enough on its own to constitute a protected business relationship. *See, e.g.*, *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 946 F. Supp. 2d 1321, 1339 (S.D. Fla. 2013) (finding that the submission of a bid does not constitute a protected business relationship). On the other hand, facts indicating that the parties engaged in continued negotiations may suffice to establish the requisite relationship. *See, e.g.*, *Monco Enters., Inc. v. Ziebart Corp.*, 673 So. 2d 491, 492 (Fla. Dist. Ct. App. 1996) (per curiam) (finding protected business relationship where franchisor had entered into negotiations for the sale of a franchise to

---

[6]   The parties agree that the Contract's choice of law clause does not govern Plaintiffs' non-contract claims and that the Court must apply Florida substantive law, as the controlling substantive law according to the forum state's conflict-of-law rules, to Blitz's tortious interference claim, Blitz's fraudulent inducement claim, and Local Access's fraudulent inducement claim. *See Md. Cas. Co. v. Williams*, 377 F.2d 389, 393 n.1 (5th Cir. 1967).

a prospective buyer); *Landry v. Hornstein*, 462 So. 2d 844, 846–47 (Fla. Dist. Ct. App. 1985) (affirming jury verdict in favor of plaintiff where substantial evidence was produced at trial demonstrating that negotiations had progressed beyond an initial offer).

Peerless attempts to portray Blitz's interactions with West as nothing more than an initial offer that Blitz swiftly rejected.  Peerless relies primarily on West's non-binding Letter of Interest in which West offered $8.5 million for Blitz's "Telecommunications business." (Doc. 124-3).  Peerless also refers to communications between Blitz and West indicating that the parties could not agree on the full terms of the sale.  (*See* Doc. 124-4, 39:13–21, 40:21–41:9, 47:21–48:11; Doc. 130-4, 57:16–58:4).

However, the record evidence indicates that Blitz and West were engaged in lengthy negotiations both before and after West presented the Letter of Interest.  Blitz and West began serious negotiations in February 2012, when Blitz officially presented its business to West at a day-long meeting in Dallas, Texas.  (Doc. 124-2; Doc. 130-6, 11:10–12:3, 16:17–20:8; Doc. 141-5, 32:17–25).   West and Blitz continued discussing the parameters of a deal for several months and engaged in a period of due diligence during which Blitz produced financial and customer information for West's review.  (Doc. 130-4, 105:15–106:22; Sealed Doc. 136-3; Doc. 141-5, 33:8–19).  After receiving the Letter of Interest, the record shows that Blitz and West continued to negotiate terms until Blitz ultimately decided to take its assets off the marker.  Blitz's President, Robert Russell, and CEO, Neil Rosenblit, testified at their depositions that the decision to reject West's offer was due to Peerless's proposal regarding Local Access and that Blitz would have consummated a deal with West but for Peerless's proposition.  (Doc. 130-4, 147:22–148:15; Doc. 130-5, 70:2–15).  Based on this evidence, a reasonable jury could conclude

that Blitz and West enjoyed a protected business relationship beyond a mere initial offer or cursory negotiations, and that the parties in all probability would have completed a deal had Peerless not interfered.  Accordingly, Peerless's Motion for Summary Judgment will be denied as to Blitz's tortious interference claim.

### 3.    Blitz's Fraudulent Inducement Claim

Peerless also moves for summary judgment on Blitz's fraudulent inducement claim.  In that claim, Blitz alleges that Peerless made a number of misrepresentations to Blitz in May 2012 and that these false promises caused Blitz to reject West's offer. Peerless moves for summary judgment on the grounds that none of these promises were false when they were made, that Blitz did not substantially change its position due to any representation made by Peerless, and that Blitz disclaimed all prior written and oral representations when Local Access signed the Contract.

To prevail on a claim for fraudulent inducement in Florida, the plaintiff must prove four elements: (1) the defendant made a false representation of material fact, (2) the defendant knew or should have known that its representation was false, (3) the defendant intended the plaintiff to rely on the false representation, and (4) the plaintiff justifiably relied on the false representation to its detriment.  *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. Dist. Ct. App. 2012), *review denied*, 119 So. 3d 444 (Fla. 2013).

As to the first element, the false representation alleged by the plaintiff ordinarily must concern a past or existing fact rather than a promise of some future action.  *Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. Dist. Ct. App. 2001).  For this reason, courts regularly find that a defendant's broken promise to perform a contract, without more, is not enough to constitute fraud.  *See, e.g., Biscayne Inv. Grp., Ltd. v. Guarantee Mgmt.*

*Servs., Inc.*, 903 So. 2d 251, 255 (Fla. Dist. Ct. App. 2005) (finding the defendant's broken promise to perform its contractual obligations insufficient to sustain a fraudulent inducement claim).  However, "if the plaintiff can demonstrate that the person promising future action does so with no intention of performing or with a positive intention not to perform, such a promise may . . . constitute a fraudulent misrepresentation." *Mejia*, 781 So. 2d at 1177.

In the Amended Complaint, Blitz alleges that Peerless made a number of false representations vis-à-vis the parties' negotiations in furtherance of the Contract, including that Peerless promised to assign or refer all of its prepaid calling card clients to Local Access, that Peerless had a certain volume of prepaid calling card traffic which it would assign to Local Access in a timely manner, and that Peerless would not provide origination services for prepaid calling card traffic in the future.  (Doc. 4, ¶¶ 24, 46).  Peerless submits that discovery has yielded no evidence indicating that it never intended to fulfill any of these promises at the time Peerless made them.  Further, Peerless cites a merger clause in the Contract disclaiming all prior oral and written representations and any claims of reliance thereon.  (*See* Contract § 21).  Peerless therefore concludes that Blitz cannot prove the false representation element of fraudulent inducement.

Regarding the presence of a merger clause in the Contract, Peerless is not entitled to summary judgment because Blitz was not a party to the Contract.  Since the merger clause only contemplates binding Local Access and Peerless, Blitz has not disclaimed any causes of action arising from an oral or written representation made by Peerless prior

to the Contract's execution.[7]   *See Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1073 (11th Cir. 2003) (recognizing the general rule in Florida that "a contract does not bind one who is not a party to the contract").

Regarding the alleged misrepresentations, the record contains pre-Contract email correspondence between Blitz and Peerless indicating that Peerless promised to cease providing origination services for prepaid calling card traffic and would assign an estimated 12 million to 22 million prepaid calling card minutes per day.  (Sealed Doc. 136-5; Sealed Doc. 136-8).  Blitz's President, Robert Russel, confirmed at his deposition that Peerless promised to refer or assign approximately 18 million to 22 million minutes of prepaid calling card traffic per day and that Peerless would eventually exit the prepaid calling card business completely.   (Doc. 130-4, 155:11–156:13, 180:20–181:19). Notwithstanding these promises, there is record evidence indicating that Peerless soon breached the Contract by failing to refer or assign prepaid calling card traffic.   For example, on December 16, 2013—six months after Local Access and Peerless executed the Contract—counsel for Peerless mailed Local Access a letter indicating that, despite what the Contract says, Peerless was never obligated to assign or refer traffic to Local Access.  (Doc. 122-2, Ex. 1).   However, at the deposition of Peerless's corporate representative, Peerless took a contrary position and acknowledged that it was the parties' intent to refer or assign all prepaid calling card customers that Peerless had to Local Access.  (Sealed Doc. 130-2, 130:23–131:23).  Moreover, Mr. Russel testified at his deposition that he believes the true reason Peerless negotiated the Contract was to

---

[7]   The Court notes that Peerless does not argue in its motion that it is entitled to summary judgment on Local Access's fraudulent inducement claim due to the existence of the merger clause.

subvert Blitz's deal with West, as Peerless did not want to lose Blitz's business to a competitor.  (Doc. 130-4, 148:22–150:3, 163:9–164:5).  Due to the temporal proximity of Peerless's alleged breach from when the Contract was signed, Peerless's contradictory interpretations of its obligations under the Contract, and the fact that West was a competitor of Peerless, a reasonable jury could conclude that Peerless had no intention of fulfilling the promises it made to Blitz, but that the proposed arrangement with Local Access was nothing more than a ruse to stop Blitz's deal with West.  Consequently, a genuine factual dispute exists as to whether Peerless made a false representation to Blitz.

As to the fourth element of a fraudulent inducement claim—that the plaintiff justifiably relied on the defendant's false representation—the plaintiff must demonstrate that it took action "amounting to [a] substantial change of position."  *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1315 (11th Cir. 1998) (quoting *Biscayne Boulevard Props., Inc. v. Graham*, 65 So. 2d 858, 859 (Fla. 1953)).  A change of position is "substantial" when it causes injury to the party changing its position.  *See, e.g.*, *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985) (finding a substantial change of position where the plaintiff lost $26,000 due to the defendant's misrepresentations); *cf. Johnson Enters.*, 162 F.3d at 1316 (finding that party to a contract failed to prove a substantial change of position because it suffered no injury as a result of the alleged fraud).

Peerless states that Blitz's fraudulent inducement claim fails this fourth element for reasons similar to its argument on Blitz's tortious interference claim.  Specifically, Peerless maintains that, since Blitz's business relationship with West was not sufficiently definite, no reasonable jury could conclude that Blitz substantially changed its position

due to any representation made by Peerless.  However, as discussed in Section III.B.2, *supra*, ample record evidence exists which would allow a reasonable jury to find to the contrary—most notably, Mr. Russell's and Mr. Rosenblit's testimony that the only reason Blitz rejected West's offer was due to Peerless's proposal concerning Local Access. (Doc. 130-4, 147:22–148:15; Doc. 130-5, 70:2–15).  Blitz also produces evidence showing that, because of its change in position, it lost out on the benefit of the West deal and that, as a result, the value of the assets Blitz would have sold to West has declined. (*See* Doc. 123-1; Doc. 124-20; Doc. 130-7, 91:5–93:3).  A genuine factual dispute therefore exists as to whether Blitz substantially changed its position such that it suffered injury as a consequence of relying on Peerless's representations.

For these reasons, Peerless is not entitled to summary judgment on Blitz's fraudulent inducement claim.

### 4.    Whether Plaintiffs Can Establish Damages

Finally, Peerless moves for summary judgment on the ground that Plaintiffs cannot establish sufficient damages for any of their claims.  On this issue, Peerless raises two arguments, both of which fail.

First, Peerless contends that the damages Plaintiffs assert are too speculative to submit to a jury.  To be sure, proof of damages is an essential element for all of Plaintiffs' claims.  *See Ethan Allen*, 647 So. 2d at 814 (identifying damages as essential element for Florida tortious interference claim); *Simon v. Celebration Co.*, 883 So. 2d 826, 833 (Fla. Dist. Ct. App. 2004) (identifying damages as essential element for Florida fraud claim); *Westlake Fin. Grp.*, 25 N.E.3d at 1174 (identifying damages as essential element for Illinois breach of contract claim).  It is well-settled under both Illinois and Florida law

that, although damages need not be subject to precise calculation, a plaintiff cannot prevail where its measure of damages is based purely on speculation or guesswork. *See Smith v. Austin Dev. Co.*, 538 So. 2d 128, 129 (Fla. Dist. Ct. App. 1989); *Westlake Fin. Grp.*, 25 N.E.3d at 1179. However, damages are not based on speculation or guesswork simply because the parties dispute their true value or present conflicting evidence; rather, a plaintiff will be prevented from recovering only where there is no evidence to support its claim of damages or where the existence of damages itself is entirely uncertain. *See Smith*, 538 So. 2d at 129; *Westlake Fin. Grp.*, 25 N.E.3d at 1179.

In this case, Blitz seeks to recover the value it would have realized had it consummated the deal with West, which Blitz calculates at $1.7 million. To support its calculation, Blitz retained an expert who intends to opine at trial that the value of Blitz's assets as of July 1, 2015 was $7.3 million, or $1.7 million less than West's $9 million. (Doc. 123-1; Doc. 124-20). As discussed in a prior order, Blitz's expert is qualified to render his opinion, utilized a reliable methodology, and is capable of assisting the jury in determining whether Blitz suffered the lost value it claims. (Doc. 252). Because Blitz's calculation of lost value is supported by sufficient record evidence, Blitz's alleged damages are not speculative as a matter of law.

On Local Access's claims, Local Access seeks to recover the revenues it lost due to Peerless not assigning or referring all prepaid calling card traffic to Local Access as required by the Contract. Using a partial list of customers which would have been assigned or referred had Peerless not breached the Contract, Local Access estimates that it would have enjoyed approximately 15.9 million minutes of prepaid calling card traffic per day. (Doc. 141-12, ¶ 5). With this number, Local Access shows that it is able

to multiply the minutes of use by the rate charged per minute to approximate the total amount of revenues it would have earned had Peerless assigned or referred the promised traffic. (*See* Doc. 124-20). Because Local Access's calculation of lost revenues is supported by sufficient record evidence, Local Access's damages are not speculative as a matter of law either.

Second, Peerless contends that Blitz's judgment in its prior lawsuit against Peerless has negated any loss incurred by Blitz in this lawsuit such that an award in this case would result in a double recovery for Blitz. Peerless believes that the prior judgment covers the same damages that were at issue in the prior lawsuit. However, as Blitz correctly observes, Peerless provides no support for this belief other than attorney argument. It is entirely unclear at this stage of the proceedings whether Blitz's claim to lost value in this case duplicates any part of Blitz's judgment in the prior lawsuit, which compensated Blitz for commissions Peerless failed to pay on certain telecommunications traffic, at least a portion of which included traffic which was **not** related to the prepaid calling card traffic at issue in this case.

Moreover, Peerless has appealed from that judgment, leaving open the possibility that the judgment could be reversed. In such an event, according to Peerless's logic, any duplicative value attributable to the prior judgment could then be recoverable through this lawsuit. Therefore, if the Court prohibits Blitz's claims in this case and the prior judgment were to be reversed, Blitz would be forever barred from pursuing the lost value it seeks in this case. On the other hand, assuming both that Blitz were to prevail in this case and that the jury's award were to duplicate the judgment in the prior case, the Court could, upon the filing of a properly supported motion by Peerless, vacate or reduce the judgment

in this case by any amount which is duplicated.  *See FDIC v. United Pac. Ins.*, 152 F.3d 1266, 1275 (10th Cir. 1998) (holding that a double recovery constitutes "extraordinary circumstances" warranting relief under Rule 60(b)(6)).  The prior judgment in favor of Blitz will therefore not act to preclude Blitz's recovery in this case, at least not at this juncture.

## IV.    CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Motion for Partial Summary Judgment (Doc. 122) is **DENIED**.

2. Defendant's Motion for Summary Judgment on Counts I Through IV (Doc. 124; Sealed Doc. 136) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on September 26, 2016.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

29